GEORGE M. ESSIG, *Appellant,* v. J. F. COLLIER, *Respondent.*[1]

O. M. *Nelson,* for appellant.
John C. *Hogan,* for respondent.

PARKER, J.—The plaintiff Essig commenced this action in the superior court for Grays Harbor county, seeking a decree setting aside conveyances of property in that county made to the defendant Collier by M. J. Keating, to the end that the property may be subjected to the payment of a judgment rendered by that court in favor of Essig and against Keating. Essig's claimed right to such relief is rested upon the ground of fraud on the part of Keating, in that he made the conveyances with intent to defraud Essig as his creditor, and in that Collier intentionally aided Keating in perpetrating such fraud. The cause, being of equitable cognizance, proceeded to trial in the superior court, sitting without a jury, and resulted in findings

[1] Reported in 292 Pac. 414.

and judgment denying to Essig any relief, from which he has appealed to this court.

Sometime prior to the commencement of the damage action in which the judgment was rendered in favor of Essig and against Keating, negotiations were commenced between Collier and Keating looking to the purchase by Collier from Keating of his business and the property used in connection therewith, consisting of an automobile gas service station, the value of which was very largely in the land and permanent improvements thereon. Keating had inherited this property from his deceased mother and had good title thereto, but her estate had not been formally probated, so the record title remained standing in the name of his deceased mother.

In July, 1929, Essig commenced, in the superior court for Grays Harbor county, an action wherein he sought recovery of damages against Keating in the sum of $25,000 for the alienation of his wife's affections. Soon thereafter Essig caused a writ of attachment to be issued in that action, and caused the sheriff of Grays Harbor county to levy the same upon several parcels of real property belonging to Keating situated in Grays Harbor county, of considerable value, though of much less value than the amount of damages claimed in his action against Keating. This levy did not cover any of the property here in question.

On September 13, 1929, Collier and Keating reached an agreement by which Keating was to convey to Collier the gas station property and business for a stated consideration of $6,500, to be paid, $4,000 thereof in cash, approximately $2,250 by the assumption by Collier of the indebtedness of the business accruing up to October 1, 1929, and the remaining $250 to be retained by Collier to pay the expenses of formally probating the estate of Keating's deceased

mother, from whom he had inherited the property, to the end that the record title should be shown to be in him, and thus make the chain of record title perfect in Collier upon the executing of a conveyance to him by Keating. It was also agreed that Keating should assign to Collier all accounts owing to the business, in consideration of which Collier should assume and pay current bills owing by the business, accruing after October 1, 1929.

At that time Collier and Keating owned each an individual one-half interest in three other lots in Aberdeen, referred to as the Broadway lots. It was then also agreed that Collier should purchase Keating's half interest in these lots for $300 cash. This was, in substance, a separate deal, though consummated at the same time as the gas station property deal. The trial court found, which finding is amply supported by the evidence, that the $6,500 agreed purchase price of the gas service station property and $300 agreed purchase price for Keating's half interest in the Broadway lots, was then a fair market value of these properties. Other findings, well supported by the evidence, rendered it plain that Collier's assumption of current bills of the business accruing after October 1, was a full and adequate consideration for the assignment to him of the accounts receivable of the business.

On October 16, 1929, Collier testified as a character witness for Keating in the trial of the damage action against him, then on trial in the superior court for Grays Harbor county. He was in court only while he was so testifying. He knew but little concerning the damage action, and practically nothing of the claims of the respective parties therein. He did not know even the amount of damages which was being claimed by Essig against Keating until after the later rendering of the judgment in that action. But, knowing of

the pendency of that action, he became somewhat cautious about consummating the purchase of the property from Keating as they had tentatively agreed. The trial court found in part as follows:

"After that [meaning after Collier had testified upon the damage trial] and before closing the deal, Collier asked Keating if there was anything in the litigation that would interfere with Keating's selling the station, and Keating said, there was absolutely nothing, and that he was assured by his attorneys that there was not the least danger of his losing the case, that even if he did, he would appeal and that if he lost the appeal, he was amply able to pay any judgment. Collier knew him to be and believed him to be a man worth $40,000; that he owned a $9,000 tract of land between Tacoma and Seattle; that he owned North Coast Bancorporation stock in the amount of $7,500; that he had deposits of quite a few thousand dollars in a number of building and loan associations and owned other stock besides having several thousand dollars in the bank. There was nothing whatever to make Collier think that Keating had any fraudulent intent; and the proof is insufficient to show any fraudulent intent on the part of Keating."

On October 17, 1929, the deal between Collier and Keating was consummated by formal execution of conveyances from Keating to Collier, by Collier's paying to Keating $4,300 in cash and Collier's going into possession of the property.

On October 18, 1929, the trial of the damage action having been concluded, judgment therein was rendered against Keating in favor of Essig, awarding him damages in the sum of $12,500. Appeal was taken from that judgment to this court. Soon thereafter Keating left Aberdeen and this state, driving his automobile, and had not returned up to the time of the trial of this action, which trial was commenced on April 15, 1930.

There is evidence to the effect that Keating was, at the time of the trial, planning to go on a trip out of the state and was desirous of closing the deal before going, and that Collier knew of Keating's intentions in that regard; but there is also evidence to the effect that Keating had been planning such a trip for a long time, and that he intended to make it an automobile pleasure trip, with intention to return to Aberdeen, and that Collier knew of Keating's previous planning of such a trip.

There is also evidence pointing to Keating's intention to return, existing both before and after he went away. Collier had been acquainted with Keating for several years and previously had some business deals with him, but nothing of common interest other than their joint ownership of the Broadway lots, and two or three loans made by him to Keating, which had been repaid long before this gas station deal was made. The controlling facts are, as we read this record, not seriously in dispute. This is more a problem of their interpretation and the inferences to be drawn therefrom touching the claimed fraudulent intent of Collier.

The applicable law of the case is well settled. Counsel for Essig invoke the rule, stated generally, that, where a debtor conveys all of his property for the purpose of defrauding his creditors, and the grantee takes with knowledge of the intent to defraud, the fact that full consideration is paid for the property will not relieve it from liability to the claims of creditors of the grantor; that is, in such case it will be considered as a conveyance in fraud of creditors and subject to be set aside accordingly; citing *O'Leary v. Duvall,* 10 Wash. 666, 39 Pac. 163, and other authorities which recognize this to be the law. Counsel for Collier invoke the rule which is, briefly, well stated in the text of 12 R. C. L. 531, as follows:

"The real test of a fraudulent conveyance in the case of a transfer made for a valuable consideration is the mutual fraudulent intent of the parties. A fraudulent intent on the part of one is not sufficient without a corresponding intent on the part of the other."

*Marinovich v. Newton,* 126 Wash. 22, 216 Pac. 876; 27 C. J. 506.

Passing the question of Keating's alleged intent to defraud Essig, by these conveyances, of his property to Collier, our real inquiry is as to the alleged intent of Collier to consciously aid Keating in defrauding Essig. This is, in its last analysis, a question of fact, which the trial judge has decided in favor of Collier. A painstaking review of the evidence convinces us that it does not preponderate against this view of the trial judge. The outstanding considerations leading us to this conclusion are: (1) Collier, by the conveyances, acquired only a part of Keating's property; that is, some $6,800 worth out of some $40,000 worth. (2) Collier actually paid full and adequate consideration for all that he acquired from Keating. (3) Collier did not know or have reason to believe that Keating intended to permanently leave Aberdeen and the state. (4) Collier did not know or have reason to believe that Keating's conveyances to him were made with intent on Keating's part to defraud Essig, or any of his creditors.

The judgment is affirmed.

MITCHELL, C. J., MAIN, and HOLCOMB, JJ., concur.

TOLMAN, J. (dissenting)—As I read the record, the evidence conclusively establishes that Collier knew that Keating intended to place his property beyond the reach of a possible judgment, and that he, Collier, actively participated and, with knowledge, assisted in carrying out Keating's plan. I therefore dissent.